UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
ALEXANDER J. CASTALDI, et al.,        :

    Plaintiffs,                       :

      -v-                           :

                                           : 14-cv-5435 (JSR)

RIVER AVENUE CONTRACTING CORP., RNC   :
INDUSTRIES LLC, EXTREME CONCRETE      :     MEMORANDUM
CORP., RICHARD J. TONYES, SR., and    :
SONIA TONYES,                         :

    Defendants.                       :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

    Plaintiffs bring this action under the Employee Retirement and

Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, et seq., and under

Section 301 of the Labor Management Relations Act ("LMRA"), 29

U.S.C. § 185 on behalf of employee benefit funds of which they serve

as trustees (collectively, the "Plaintiff Funds").[1] Defendants are

three entities engaged in the concrete construction business, namely

River Avenue Contracting Corp. ("River"), Extreme Concrete Corp.

("Extreme") and RNC Industries, LLC ("RNC"), and their joint owners,

husband and wife Richard Tonyes, Sr. ("Tonyes, Sr.") and Sonia

---

[1] Specifically, Plaintiffs are trustees of two groups of funds: (1)
the "Cement Workers' Funds," comprising the Cement and Concrete
Workers Pension Trust Fund, Cement and Concrete Workers Welfare
Trust Fund, Cement and Concrete Workers Annuity Trust Fund, Cement
and Concrete Workers Scholarship Trust Fund, and Cement and Concrete
Workers Training and Education Trust Fund; and (2) the "Cement
Masons' Funds," comprising the Cement Masons' Local 780 Trust Fund,
Cement Masons' Local 780 Pension Fund, Cement Masons' Local 780
Annuity Fund, Cement Masons' Local 780 Vacation Fund, and Cement
Masons' Local 780 Apprenticeship Fund.

Tonyes. Plaintiffs seek to recover unpaid contributions to the Plaintiff Funds, which they contend defendants were required to make under the applicable collective bargaining agreements.

By way of background, Plaintiffs allege that, from about August 2003 until March 2, 2011, River was a member of the Association of Concrete Contractors of New York, Inc. (the "Association"), which served as its collective bargaining agent. See Complaint dated July 18, 2014, Castaldi v. River Ave. Contracting Corp., No. 14-cv-5435 ("Castaldi Compl.") ¶¶ 12-13; Complaint dated Oct. 31, 2014, Castignoli v. River Ave. Contracting Corp., No. 14-cv-8699 ("Castignoli Compl.") ¶¶ 12-13.[2] As such, River was bound by the Association's collective bargaining agreements with the Cement and Concrete Workers District Council (the "Cement Workers' Agreement") and the Cement and Masons Local 780 (the "Cement Masons' Agreement") (collectively, the "Association Agreements"). Castaldi Compl. ¶ 14; Castignoli Compl. ¶ 14. Each Association Agreement required River to contribute stated amounts to the Plaintiff Funds for each hour of covered work performed within their respective jurisdictions. Castaldi Compl. ¶ 15; Castignoli Compl. ¶ 15. Furthermore, both of the Association Agreements expressly applied not just to River, but also to River's principals and to any other enterprise conducting substantially identical business under River's ownership,

---

[2] The Castaldi and Castignoli actions were consolidated under the above caption by Stipulation and Order dated Dec. 9, 2014. See ECF No. 33.

management, or control. <u>Castaldi</u> Compl. ¶ 17; <u>Castignoli</u> Compl. ¶ 17.

According to Plaintiffs, defendants sought to evade their contribution obligations by submitting reports to the Plaintiff Funds that purported to identify the hours of covered work performed by River employees, while omitting any reference to covered work performed by employees of Extreme and RNC. <u>Castaldi</u> Compl. ¶¶ 18-19; <u>Castignoli</u> Compl. ¶¶ 18-19. In fact, Plaintiffs contend, River, Extreme and RNC operated as alter egos of one another, performing the same work, under the same management, from the same offices, with the same employees, customers, and vendors, without observing any corporate formalities, and under the complete domination of the Tonyes defendants. <u>Castaldi</u> Compl. ¶¶ 23-53; <u>Castignoli</u> Compl. ¶¶ 25-55.

On the basis of the foregoing allegations, Plaintiffs assert five claims: (I) breach of the Association Agreements in violation of Sections 502 and 515 of ERISA, 29 U.S.C. §§ 1132, 1145 (against River); (II) breach of the Association Agreements in violation of Sections 502 and 515 of ERISA, 29 U.S.C. §§ 1132, 1145 (against RNC, as alter ego of River); (III) breach of the Association Agreements in violation of Sections 502 and 515 of ERISA, 29 U.S.C. §§ 1132, 1145 (against Extreme, as alter ego of River); (IV) breach of the Association Agreements in violation of Section 301 of the LMRA, 29 U.S.C. § 185 (against River, RNC, and Extreme); and (V) common law

3

fraud under ERISA (against RNC, Extreme, Tonyes, Sr., and Sonia
Tonyes).

Following discovery, Plaintiffs moved for partial summary
judgment on four issues: (1) that River, Extreme, and RNC are alter
egos; (2) that Tonyes, Sr. and Sonia Tonyes are individually liable
to the Plaintiff Funds; (3) that the Order of Discontinuance and
Stipulation of Settlement dated April 2, 2010 between the Cement
Workers' Funds, River, Extreme, and two other Tonyes-affiliated
entities (the "Settlement Agreement") does not bar any of
Plaintiffs' claims; and (4) that the statute of limitations does not
bar Plaintiffs' claims for damages accruing before June 18, 2008. By
Order dated May 29, 2015, the Court granted Plaintiffs' motion with
respect to alter ego status, individual liability, and the effect of
the Settlement Agreement, but denied it with respect to the statute
of limitations. This Memorandum sets forth the reasons for those
rulings.

Pursuant to Rule 56(a), Fed. R. Civ. P., the movant is entitled
to summary judgment only if it demonstrates that "there is no
genuine dispute as to any material fact and the movant is entitled
to judgment as a matter of law." The movant bears the initial burden
of "identifying those portions of 'the pleadings, depositions,
answers to interrogatories, and admissions on file, together with
the affidavits, if any,' which it believes demonstrate the absence
of a genuine issue of material fact." Celotex Corp. v. Catrett, 477
U.S. 317, 323 (1986). The burden then shifts to the non-moving party

to "come forward with evidence that would be sufficient to support a jury verdict in its favor." Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 91 (2d Cir. 2002). "Mere conclusory allegations or denials will not suffice." Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986). The motion will be granted only if, drawing all reasonable inferences in favor of the non-moving party, the court concludes that no reasonable trier of fact could find in that party's favor. H.L. Hayden Co. of New York v. Siemens Med. Sys., Inc., 879 F.2d 1005, 1011 (2d Cir. 1989).

    The first issue on which Plaintiffs seek summary judgment is a finding that River, RNC, and Extreme are alter egos. In the ERISA context, alter ego doctrine provides "an analytical hook to bind a non-signatory to a collective bargaining agreement." Truck Drivers Local Union No. 807, I.B.T. v. Reg'l Imp. & Exp. Trucking Co., 944 F.2d 1037, 1046 (2d Cir. 1991). In other words, "[d]etermining that an entity is an alter ego 'signifies that, for all relevant purposes, the non-signatory is legally equivalent to the signatory and is itself a party to the [collective bargaining agreement].'" Ret. Plan of UNITE HERE Nat. Ret. Fund v. Kombassan Holding A.S., 629 F.3d 282, 288 (2d Cir. 2010) (citation omitted). The purpose of the alter ego doctrine in this context is to prevent an employer from evading its obligations under a collective bargaining agreement "through a sham transaction or technical change in operations." Truck Drivers, 944 F.2d at 1046. To that end, "courts observe 'a

general federal policy of piercing the corporate veil when necessary.'" Kombassan, 629 F.3d at 288.

The test for determining whether two companies are alter egos for ERISA purposes is "flexible" and involves "weigh[ing] the circumstances of the individual case." Goodman Piping Prods., Inc. v. NLRB, 741 F.2d 10, 11 (2d Cir.1984). The "hallmarks of the alter ego doctrine include 'whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership.'" Lihli Fashions Corp. v. N.L.R.B., 80 F.3d 743, 748 (2d Cir. 1996) (citation omitted). For example, summary judgment of alter ego status is appropriate where the undisputed facts show that two entities have "identical management, supervision, and ownership," "engage in substantially the same type of work," "lease[] identical office space … and use[] many of the same business institutions," and one company "actually took over contracts originally awarded" to the other. Bricklayers & Allied Craftworkers Local 2 v. C.G. Yantch, Inc., 316 F. Supp. 2d 130, 144 (N.D.N.Y. 2003); see also Plumbers, Pipefitters & Apprentices Local Union No. 112 Pension, Health & Educ. & Apprenticeship Plans ex rel. Fish v. Mauro's Plumbing, Heating & Fire Suppression, Inc., 84 F. Supp. 2d 344, 351 (N.D.N.Y. 2000) (granting summary judgment of alter ego status); Bourgal v. Robco Contracting Enterprises, Ltd., 969 F. Supp. 854, 863 (E.D.N.Y. 1997) aff'd, 182 F.3d 898 (2d Cir. 1999) (same).

In support of their motion, Plaintiffs have submitted overwhelming and largely uncontroverted evidence that River, Extreme, and RNC operated during the relevant period as alter egos.

First, the three companies operated under identical management.[3] All three entities were managed by RAC Management Corp. ("RAC Management"), a company of which Tonyes, Sr. was the president and sole owner. See Declaration of Susan Jennik dated Feb. 20, 2015 ("Jennik Decl.") Ex. 17, at 21-25. RAC Management performed numerous functions on behalf of all three entities, including bookkeeping, payroll, accounts payable and receivable, tax preparation, estimating projects, preparing bids, negotiating contracts, obtaining insurance, and personnel administration. See Plaintiffs' Local Civil Rule 56.1 Statement of Undisputed Facts ("Pl. Rule 56.1") ¶¶ 61-68, 73, 104, 108. There were no written agreements describing the services that RAC Management provided to River, Extreme, and RNC, nor was there any formula for determining the fees that RNC Management would charge, at least with respect to RNC. Id. ¶¶ 77-79; Jennik Decl. Ex. 3, at 21.

Moreover, in performing these services, RAC Management failed to treat River, RNC, and Extreme as separate entities. For example, it assigned project numbers to the concrete construction jobs

---

[3] The following facts are either undisputed, or (which amounts to the same) have been only conclusorily denied by defendants, in violation of Local Civil Rule 56.1. See U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3, No. 00-cv-4763, 2006 WL 2136249, at *3 (S.D.N.Y. Aug. 1, 2006) (striking portions of opposition to Rule 56.1 Statement that failed to meet requirements of Local Rule 56.1).

performed by the three companies in the order the jobs were
obtained, regardless of whether the project was a River, RNC, or
Extreme job. Pl. Rule 56.1 ¶ 67. It also maintained a single
integrated payroll, which identified each employee as being
affiliated with River, RNC, or Extreme for a given week through a
system of color coding. Id. ¶¶ 69-71. RAC Management further
maintained a combined roster of monthly bills for the three
companies, a common list of bank check order dates, common tax
liability worksheets (prepared by a shared set of accountants), and
a common list of vendors with tax exempt status. Id. ¶¶ 87-90.

Second, Tonyes, Sr. dominated all three entities. All three are
located on premises that are wholly owned, either directly or
indirectly, by Tonyes, Sr. and Sonia Tonyes. Id. ¶¶ 5, 7, 85-86.
There is no dispute that Tonyes, Sr. owned and controlled River. Id.
¶ 8. As to Extreme, although Sonia Tonyes was the nominal owner and
sole employee, id. ¶¶ 57, 167, she testified that "I was the owner
on paper, but he was the owner – he did the work." Pl. Rule 56.1 ¶
57. Indeed, in 2012, Tonyes, Sr. admitted under oath to being the
"owner and operator of Extreme" in connection with his plea of
guilty to a criminal tax evasion charge in the Eastern District of
New York. Id. Ex. 30, at 19. In the same case, Tonyes, Sr.'s
attorney submitted a pre-sentencing letter to the court representing
that Tonyes, Sr. had "organized and founded, from the ground up,"
various companies, including Extreme. Id. ¶ 58. Furthermore, the
undisputed evidence showed that Tonyes, Sr. negotiated and signed

contracts on Extreme's behalf, a fact that further indicates that he was its true owner and operator. Id. ¶ 107.[4]

As to RNC, the evidence likewise showed that Tonyes, Sr. was the real party in interest. RNC was nominally co-owned by the Tonyes' son, Richard Tonyes, Jr. and a long-time Tonyes confederate, Robert Dugan, see Jennik Decl. Ex. 24, at 47. However, Tonyes, Sr. engaged in transactions on behalf of RNC, including preparing bids and estimating labor hours for jobs, Pl. Rule 56.1 ¶¶ 105-06, negotiating and signing contracts, id. ¶ 114, 210-15, and entering a lease agreement, id. ¶ 110. Furthermore, Tonyes, Sr.'s email correspondence demonstrates that he had authority to act on RNC's behalf in its dealings with customers, vendors, and other third parties, id. ¶¶ 45, and to make personnel decisions affecting RNC employees, such as approving vacation pay and pay increases, id. ¶¶ 146-53.

Third, the three entities utterly failed to observe even the barest of corporate formalities. River and Extreme, which were organized as corporations, never issued any shares of stock, never held a shareholders' meeting, and never elected a Board of Directors or held any Directors' meetings of any sort. Id. ¶ 48. RNC, which was organized as a limited liability company, had no operating agreement and there were no records of any meetings of its members. Id. ¶ 49.

---

[4] The Court, with some dismay, notes that these statements directly contradict sworn statements that Tonyes, Sr. made in previous cases before this Court, in which he represented that he did not own Extreme. Id. ¶¶ 53-54; Jennik Decl. Ex. 17, at 22 & Ex. 28.

Moreover, all three entities regularly transferred large sums of money to other Tonyes-owned entities and to Sonia Tonyes individually with zero or only minimal documentation. Id. ¶¶ 116-18, 154-73.

Finally, River, RNC, and Extreme engaged in the same work, for the same customers, using the same equipment, vendors, and suppliers, performed by many of the same employees. Specifically, as to the three entities' common work and customers, Plaintiffs' evidence demonstrated that: River and RNC described their business purpose in nearly identical terms in letters sent to potential customers, id. ¶¶ 95-96; River and RNC at times each claimed to have worked on the same jobs, referred to as The Arbor, "540w28+art," Casa de la Luna y de la Estrella, and St. Ann's Terrace, id. ¶¶ 98-99; Extreme and RNC had at least one long-time customer in common, Joy Construction, id. ¶ 97; on at least one occasion, Extreme assigned a subcontract to RNC without consideration (so far as Dugan, RNC's nominal co-owner, could recall), id. ¶¶ 81-82; on another occasion, River obtained a contract for a construction project, but RNC actually performed the work, obtained the insurance, sent invoices, and received payment, id. ¶¶ 207-09.

Regarding common equipment, vendors, and the like, the evidence showed that there were at least eleven vendors and suppliers used by all three companies, id. ¶ 91, and that RNC and River both lease equipment from Specialty Trucking and Equipment, Inc., an entity owned by the Tonyes defendants' son and daughter, but which Tonyes,

10

Sr. "helps" to manage, see Jennik Decl. Ex. 3, at 27-28. As to the
overlapping employees, Plaintiffs' evidence demonstrated: that at
least eight employees were at various times identified as employees
of River, Extreme, and/or RNC, see Pl. Rule 56.1 ¶¶ 184-205; that
RAC Management kept a common list of shop employees, each of whom
was listed as affiliated with one of the three entities, but who
were nonetheless all supervised by the same individual, id. ¶¶ 93-
94; that at times, River provided employees to drive trucks on RNC
jobs, id. ¶ 75; and that fifteen employees of RAC Management also
had email addresses from both RNC and River, id. ¶ 74. In short,
plaintiffs' showing is more than sufficient to shift the burden to
defendants to demonstrate the existence of a triable issue.

Defendants do not contest that Extreme was an alter ego of
River, nor do they direct the Court to any evidence showing that it
is not. With respect to RNC, they argue that the deposition
testimony of Richard Tonyes, Jr. and Robert Dugan raises a triable
issue of fact. Specifically, Tonyes, Jr. and Dugan claimed at
deposition that they jointly own and control RNC. Dugan, for his
part, testified that he is a 50% owner of RNC and that: "I run
[RNC]. I run day-to-day operations, supervise everybody, and, you
know, I control the field operations in the whole company."
Declaration of Christopher Smith dated Apr. 3, 2015 ("Smith Decl.")
Ex. B at 30, 45. Similarly, Tonyes, Jr. testified that he co-owned
RNC and that: "I ran all field operations." Id. Ex. G.

However, these assertions, even if credited, would be an insufficient basis for a reasonable factfinder to conclude that RNC is a separate entity and not an alter ego of River. Even if it were true that Tonyes, Jr. and Dugan ran RNC's "field operations," that fact is not inconsistent with plaintiffs' copious evidence that RNC and River operated under identical management, performed the same work, and used the same vendors, suppliers, equipment and employees. Nor is Tonyes, Jr.'s claim that he owns RNC availing. Where, as here, there are numerous indicia of alter ego status, close family connections between companies can satisfy the "continuity of ownership" factor. See Mason Tenders Dist. Council Welfare Fund v. ITRI Brick & Concrete Corp., No. 96-cv-6754, 1997 WL 678164, at *14 (S.D.N.Y. Oct. 31, 1997). Accordingly, the Court has no difficulty in concluding that Plaintiffs are entitled to judgment as a matter of law that River, RNC, and Extreme are alter egos, and that all three are bound by the Association Agreements.

The second issue on which Plaintiffs seek summary judgment is the individual liability of Tonyes, Sr. and Sonia Tonyes. As a general proposition, "an individual is not liable for corporate ERISA obligations solely by virtue of his role as officer, shareholder, or manager." Sasso v. Cervoni, 985 F.2d 49, 50 (2d Cir. 1993). Nonetheless, "at least to the extent that a controlling corporate official defrauds or conspires to defraud a benefit fund of required contributions, the official is individually liable under Section 502 of ERISA, 29 U.S.C. § 1132, just as he would be liable

12

for unpaid minimum wages under FLSA, even if the traditional conditions for piercing the corporate veil are not met." Leddy v. Standard Drywall, Inc., 875 F.2d 383, 388 (2d Cir. 1989). Thus, Plaintiffs must show, first, that the Tonyes defendants were "controlling corporate officials," and second, that they "defrauded or conspired to defraud" the Plaintiff Funds. See Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Servs. Fund & Annuity Fund v. Lollo, 35 F.3d 29, 33 (2d Cir. 1994), as amended (Sept. 9, 1994).

Plaintiffs' evidence amply meets this standard. First, both Tonyes, Sr. and Sonia Tonyes are "controlling corporate officials" of the three alter ego companies. As discussed above, Tonyes, Sr. completely dominated River, RNC, and Extreme, both controlling their operations and acting on their behalf vis-à-vis third parties. See Trustees of Bldg. Serv. 32B-J Pension, Health & Annuity Funds v. Hudson Serv. Corp., 871 F. Supp. 631, 638 (S.D.N.Y. 1994) (finding individual to be "controlling corporate official" on ground that he "exercised complete control over" company "as its president and sole shareholder"). Sonia Tonyes, for her part, was nominal owner of one of the companies and played a dominant role in managing all the companies through RAC Management. Most importantly, she was responsible for the companies' ERISA reporting, id. ¶ 32, and on numerous occasions personally signed the fraudulent remittance reports that were sent to the Funds, id. ¶ 33. Moreover, she received numerous transfers of funds from the Tonyes-controlled

entities, for which she could offer no legitimate explanation.
Jennik Decl. Ex. 3, at 124-131. Her direct role in the companies'
fraud weighs heavily in favor of finding her personally liable. See
New York City Dist. Council of Carpenters Pension Fund v. Quantum
Const., No. 06-cv-13150, 2008 WL 5159777, at *7 (S.D.N.Y. Dec. 9,
2008).

Second, Plaintiffs have amply demonstrated that the Tonyes
defendants "defraud[ed] or conspire[d] to defraud" the Plaintiff
Funds. The remittance reports that defendants submitted to the
Plaintiff Funds systematically omitted hours worked by employees of
RNC and Extreme. Id. ¶¶ 29-31, 39; Jennik Decl. Exs. 16, 19; see also
Bourgal, 969 F. Supp. at 864 (granting summary judgment of
individual liability where corporate officer "knowingly
underreported hours worked by employees in covered employment in
order to avoid paying the contractually required benefits
contributions"). There is no merit to defendants' argument that they
were not required to report work performed by entities other than
River itself. To the contrary, the Association Agreements, by their
own terms, unambiguously applied to affiliated entities such as RNC
and Extreme.[5]

---

[5] The Concrete Workers' Agreement provides that it applies to work
performed by the employer:

under its own name or under the name of another, as a
corporation, company, partnership, or any other business
entity, including joint venture or sole proprietorship, and
the two (2) enterprises have substantially identical
management, business purpose, operation, equipment,

Moreover, Plaintiffs produced a "smoking gun" demonstrating defendants' fraudulent intent. Specifically, many of the remittance reports bear the signature "S. Smith." Defendants now admit, however, that no one by that name ever worked at River, RAC Management, RNC, or Extreme. Pl. Rule 56.1 ¶¶ 36-38, 42-44, 46. Defendants' use of a false name strongly indicates that they intended to defraud the Plaintiff Funds. In addition, as discussed above, Tonyes, Sr.'s attempt to obscure his role in Extreme in prior sworn testimony before this Court, which he has since contradicted in other sworn statements, further evidences his fraudulent intent. See supra note 4.

Defendants respond that the Plaintiff Funds could not have reasonably relied on the remittance reports because they knew or should have known that they were false. Specifically, they argue that plaintiffs were on notice that the reports did not necessarily

---

customers, supervision and/or ownership, wherein the employer exercises either directly or indirectly any significant degree of ownership management or control…

Pl. Rule 56.1 ¶ 24. The Concrete Masons' Agreement provides:

If an Employer covered by this Agreement or any such owner or principal forms or acquires by purchase, merger or otherwise, an interest, whether by ownership, stock, equitable or managerial, in another company, corporation, partnership or joint venture, performing bargaining unit work within this jurisdiction, this Agreement shall cover such other operation and such other bargaining unit Employees shall be considered an accretion to the bargaining unit River Reports to the Cement Worker Funds.

Id. ¶ 28.

account for work performed by Extreme and RNC. This argument stems
from a previous lawsuit filed in 2007 by the Cement Workers' Funds
against River Avenue, seeking to recover delinquent contributions
that they claimed were due to the Funds based on a payroll audit.
See Cement and Concrete Workers District Council Welfare Fund v.
River Avenue Contracting Corp., No. CV-07-2290 (E.D.N.Y.). On
January 18, 2008, in connection with settlement negotiations in that
action, the Funds' then-counsel, Joseph Kaming, sent a letter to
counsel for River Avenue. In that letter, Kaming stated: "If [the
settlement offer is] not accepted, we will have to audit all books
of all companies and this matter can not be resolved." Ambroise
Decl. Ex. 1, at CCW007260. Defendants interpret Kaming's reference
to "all books of all companies" to indicate that he was aware of the
existence of companies affiliated with River. This vague and passing
reference, however, does not remotely support the conclusion that
plaintiffs were aware of RNC and Extreme's existence, let alone of
the falsity of the remittance reports, and therefore fails to raise
a triable issue of fact regarding defendants' fraudulent intent.

Accordingly, the Court finds that Tonyes, Sr. and Sonia Tonyes
are individually liable for any amounts owing to the Plaintiff
Funds.

The third issue as to which Plaintiffs seek summary judgment is
the effect of the Settlement Agreement. This issue arises from
another previous litigation between some of the parties to this
suit. In 2009, the Cement Workers' Funds filed a separate lawsuit

16

against River, Extreme, RAC Management, and another Tonyes-

affiliated entity, RAC Realty, seeking to recover unpaid

contributions. See Cement and Concrete Workers District Council

Welfare Fund v. River Avenue Contracting Corp., No. CV-09-715

(E.D.N.Y.). On April 2, 2010, the parties to that action filed the

Settlement Agreement, pursuant to which River agreed to pay $33,750

for the audit period from the "beginning of time" through December

31, 2008. The Settlement Agreement provided that:

> It is understood and agreed by the Funds and River Avenue
> Contracting Corp. as well as so designated in the caption
> Affiliated entities known as Extreme Concrete Corp., RAC
> Realty and RAC Management that the settlement amount herein
> represents payment of all amounts owed by River Avenue
> Contracting Corp. as well as so designated in the caption
> Affiliated entities known as Extreme Concrete Corp., RAC
> Realty and RAC Management to the Funds for the periods from
> the beginning of time through December 31, 2008 under the
> terms of the District Council of Cement and Concrete Workers
> comprised of Local No. 6-A, Local No. 18-A, and Local No.
> 20, LIUNA, AFL-CIO agreement and the terms of the trust
> agreements for the Funds. This settlement does not include
> any monies owed or which may be owed for periods after
> December 31, 2008.

Jennik Decl., Ex. 83, ¶ 4. Defendants argue that the Settlement

Agreement precludes claims by the Cement Workers' Funds relating to

pre-2009 work performed, not only by Extreme, which was a party to

the Agreement, but also by RNC, which was not.

The Settlement Agreement, by its express terms, does not

release any claims against RNC. RNC was not a party to the

Settlement Agreement and no claims based on work it performed were

raised in that litigation. Nor could they have been, as defendants

17

failed to disclose its existence. Representatives of the Plaintiff
Funds testified that they learned of RNC's existence within the past
two and a half years, well after the Settlement Agreement was
entered. See Declaration of Serge Ambroise dated Apr. 17, 2015, Exs.
2, 3. Accordingly, the Settlement Agreement could only bar the
Cement Workers' Funds' pre-2009 claims to the extent they were based
on work performed by River or Extreme.[6] See Gesualdi v. Juda Const.,
Ltd., No. 10-cv-1799, 2011 WL 5075438, at *10 (S.D.N.Y. Oct. 25,
2011) (finding that settlement did not release claims for
subcontracted work where existence of such claims would not have
been picked up by routine audit). But the Cement Workers' Funds do
not seek damages for any such claims – all of their pre-2009 damages
claims relate to work performed by RNC. See Plaintiffs' Mem. in
Support of Mot. for Summary Judgment dated Feb. 20, 2015, at 33.
Accordingly, the Court granted summary judgment that the Settlement
Agreement does not bar any of the claims asserted in this action.

The final issue concerns the statute of limitations. In the
absence of an express statute of limitations under ERISA, the Court
applies the most analogous state statute of limitations, in this
case, breach of contract. See Guilbert v. Gardner, 480 F.3d 140, 149
(2d Cir. 2007) (citing Union Pac. R. Co. v. Beckham, 138 F.3d 325,
330 (8th Cir. 1998)). Under New York law, a claim for breach of
contract must be brought within six years of the breach. N.Y.

---

[6] It goes without saying that the Settlement Agreement does not bind
the Cement Masons' Funds, who were not parties to the 2009 lawsuit.

C.P.L.R. 213(2). Defendants argue that any claim for damages accruing before June 18, 2008 — six years before the Complaint was filed — is time-barred.

Plaintiffs argue that they should be permitted to recover for the period before June 18, 2008 under the doctrine of equitable estoppel. Under that doctrine, the Court may bar the application of the statute of limitations where the defendant has fraudulently concealed the existence of the plaintiff's cause of action. See Abercrombie v. Andrew College, 438 F. Supp. 2d 243, 265 (S.D.N.Y. 2006). This doctrine, however is to be "invoked sparingly and only under exceptional circumstances." Id. (citation omitted). The plaintiff must prove specific "efforts by the defendant — above and beyond the wrongdoing upon which the plaintiff's claim is founded — to prevent the plaintiff from suing in time." McAnaney v. Astoria Fin. Corp., No. 04-cv-1101, 2007 WL 2702348, at *8 (E.D.N.Y. Sept. 12, 2007). In addition, the plaintiff must demonstrate that it exercised due diligence, meaning "that the action was brought within a reasonable period of time after the facts giving rise to the equitable tolling or equitable estoppel claim 'have ceased to be operational.'" Id.

Plaintiffs fall short of carrying this burden. They offer little more than the bare assertion that they were not aware of the alter ego relationship between River, RNC, and Extreme until March 28, 2014, when this Court issued its summary judgment opinion in the related case of Moore v. River Avenue Contracting Corp., No. 13-cv-

4205 (S.D.N.Y.), ECF Dkt. No. 97. Moreover, they fail to proffer evidence of any affirmative acts, beyond those that form the basis of their claims, taken by defendant to prevent them from bringing suit. To the contrary, the fact that the Concrete Workers' Funds' sued River and Extreme in 2009 suggests that they, at least, were aware of the alter ego relationship between those two entities at that time. Accordingly, with respect to the statute of limitations issue, the Court determined that triable issues of fact remain.

For the foregoing reasons, the Court granted plaintiffs' summary judgment motion with respect to the three entities' alter ego status, the individual liability of Tonyes, Sr. and Sonia Tonyes, and the effect of the Settlement Agreement, but denied plaintiffs' motion with respect to the statute of limitations issue. Trial on the remaining issues will begin on June 22, 2015 at 9:00 AM.

Dated:    New York, NY
          June 20, 2015                        JED S. RAKOFF, U.S.D.J.